**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 18-384** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT BABBITT** | : | |

**MEMORANDUM OPINION**

Savage, J.                                                    **October 21, 2020**

      Moving for a reduction of sentence under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), Robert Babbitt, a prisoner at FCI Elton, contends that the COVID-19 pandemic, his age, his multiple underlying medical conditions and the fact that he has contracted COVID-19 while incarcerated constitute extraordinary and compelling reasons warranting a reduction of his sentence.[1] He claims that he is committed to his rehabilitation, he has not had any disciplinary issues while incarcerated, and he can safely quarantine and serve the remainder of his sentence at home.[2] The government argues that the COVID-19 pandemic and Babbitt's compromised health do not support a reduction in sentence because his medical problems are stable and appropriately managed in prison, and he poses a danger to the community because of his COVID-19 diagnosis and the seriousness of his crime.[3] The government also points out that the victims of Babbitt's offenses and their families oppose his release.[4]

      Babbitt was convicted of possession and receipt of child pornography. He had no

---

[1] Def.'s Em. App. for Mod. of Sent. at 8-9 (ECF No. 32).

[2] *Id.* at 1-2, 10.

[3] Govt.'s Resp. in Opp. to Def.'s Mot. to Reduce Sent. at 11-21 (ECF No. 34).

[4] Govt.'s Supp. Resp. in Opp. to Def.'s Mot. to Reduce Sent. at 1-2, Ex. A-C (ECF No. 37).

prior criminal record. His total offense level was 30 and his criminal history category was I. The applicable Sentencing Guideline range was 97 – 121 months.

Babbitt is 66 years old and suffers from several serious medical conditions, including angina pectoris, hypertension, hyperlipidemia and chronic ear infections causing extreme hearing loss.[5] Prior to his incarceration, he suffered a heart attack and received three stent implants and had double bypass surgery.[6] He also had a stroke that caused memory loss.[7] He has a significant history of kidney stones, with two past episodes requiring surgery.[8] In addition to chronic bronchitis, he has an 80% blocked artery that causes chest pains and shortness of breath.[9] In April 2020, while incarcerated, he developed a fever, body aches, coughing and trouble breathing, and was placed in isolation for eight days.[10] Without testing, he was returned to the general population.[11] A month later, he tested positive for COVID-19 and was again placed in isolation.[12] He appears to have recovered and no longer has any apparent symptoms.[13]

Taking into consideration his medical conditions which were known at the time of sentencing, he was sentenced to the mandatory minimum term of 60 months followed by

---

[5] Bureau of Prisons Health Serv. Records at Babbitt_00059, Babbitt_00072–00073, Babbitt_00080 (ECF No. 39) ("Health Services Records").

[6] *Id.* at Babbitt_00072, Babbitt_00074.

[7] *Id.* at Babbitt_00074, Babbitt_00080.

[8] *Id.* at Babbitt_00089.

[9] Govt.'s Resp. Ex. A.

[10] Health Services Records at Babbitt_00044, Babbitt_00047, Babbitt_00049 – 50.

[11] *Id.* at Babbitt_00044.

[12] *Id.* at Babbitt_00040-41.

[13] *Id.*

six years of supervised release. He has served 25 months, more than one-third of his sentence at FCI Elkton in Lisbon, Ohio. During that time, he has had no disciplinary issues.[14] He is scheduled to be released on December 14, 2022.

After considering all the factors set forth in 18 U.S.C. § 3553(a), the circumstances of the COVID-19 pandemic, Babbitt's serious health risks and the danger of re-infection while incarcerated, we conclude that Babbitt has presented an extraordinary and compelling reason warranting a sentence reduction. We also find that he is not a danger to the community. Therefore, we shall grant his motion and reduce his sentence.

### Compassionate Release

*The Historical Statutory Framework*

A court may reduce a defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a), if it finds that extraordinary and compelling reasons warrant a reduction and a reduction is consistent with applicable policy statements issued by the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A). Congress did not define what constitutes an extraordinary and compelling reason, leaving it to the Sentencing Commission to do so.

In its policy statement and commentary addressing Section 3582(c)(1)(A), the Sentencing Commission set forth three specific extraordinary and compelling reasons. U.S.S.G. § 1B1.13, cmt. n. 1. Application Notes 1(A) through 1(C) detail qualifying medical, age and family circumstances.

Making it clear that these were not the only reasons that may be considered extraordinary and compelling, the Sentencing Commission added an "other reasons"

---

[14] Def.'s Em. App. at 1-2.

category that provides a reduction may be warranted by an "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, cmt. n. 1(D). At the same time, it delegated the Bureau of Prisons ("BOP") Director to define what "other reasons" qualify under subdivision 1(D). *Id.*

In exercising its delegated authority, the BOP issued Program Statement 5050.49 setting forth its criteria for compassionate release.[15] The Program Statement included criteria for granting requests based on medical, age and family circumstances. It also listed factors to be considered for all requests.[16] After passage of the First Step Act (FSA), the BOP amended the Program Statement outlining the circumstances that it deemed may justify relief.[17] However, those circumstances were limited to the same bases identified by the Sentencing Commission – medical, age and family circumstances. Significantly, despite having been given the authority to do so, the BOP has not identified what other reasons may support compassionate release.

---

[15] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.49 (Aug. 12, 2013), https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf.

[16] *Id.* at 3-10. Similar to the Section 3553(a) factors, these factors include the nature and circumstances of the offense, the defendant's criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustments, disciplinary infractions, the defendant's personal history derived from the Pre-Sentence Report, the length of the defendant's sentence and the amount of time served, the defendant's current age, the defendant's age at the time of the offense and sentencing, any release plans and whether release minimizes the severity of the offense. *Id.* at 10.

[17] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.50 (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf. These changes include requiring inmates be informed of the availability and process for sentence reductions, modifications to the definition of "terminally ill," requiring notice and assistance for terminally ill inmates, requiring requests for terminally ill inmates be processed within 14 days, requiring notice and assistance for debilitated offenders and specifying that inmates may file motions directly in court after exhausting administrative remedies or 30 days from the receipt of the request by the warden. *Id.* at 3.

Until Congress amended the compassionate release statute in the FSA, the BOP had the exclusive authority to move for a sentence reduction.[18] With that authority came the sole responsibility for determining what reasons other than medical condition, age, and family circumstances qualified as extraordinary and compelling. If the BOP did not consider a defendant's reason extraordinary and compelling and did not file a motion, the defendant had no recourse to the courts.[19] Consequently, there was no way to discern what circumstances, if any, constituted an extraordinary and compelling reason other than the enumerated ones.

The process changed when Congress passed the FSA in December 2018. Congress displaced the BOP as the exclusive gatekeeper of motions for sentence reductions. Now, a defendant, after exhausting administrative remedies, may move for a reduction under 18 U.S.C. § 3582(c)(1)(A).

Congress changed the process in reaction to the BOP's inconsistent and infrequent use of the compassionate release mechanism. The BOP had filed few motions.[20] From 1984 to 2013, the BOP filed only approximately 24 motions annually.[21] From 2013 to 2017, of the 5,400 applications for compassionate release, the BOP approved only six percent.[22] During that period, 266 people who had requested

---

[18] "How the First Step Act Changed Federal Compassionate Release," Compassionate Release: A Project by Brandon Sample, Attorney at Law (2020), https://compassionaterelease.com/first-step-act-compassionate-release/.

[19] *Id.*

[20] *United States v. Redd*, 444 F. Supp. 3d 717, 725 (E.D. Va. 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the [BOP] filed motions for a sentence reduction on behalf of defendants.").

[21] *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

[22] "How the First Step Act Changed Federal Compassionate Release," *supra* note 18.

compassionate release died while awaiting the BOP's determination to file motions on their behalf.[23] The Inspector General's report finding that the BOP rarely moved for compassionate release under its own policies led the Sentencing Commission to amend its policy to encourage the BOP to use the mechanism more frequently. *See* "§ 1B1.13 (Policy Statement) – Compassionate Release," U.S. Sentencing Commission (2016), https://www.ussc.gov/sites/default/files/elearning/2016-guideline-amendments/story_ content/external_files/Comp%20Release.pdf (announcing the broadening of eligibility criteria for compassionate release to expand the pool of candidates). A defendant himself may now move for a sentence reduction after exhausting administrative remedies. 18 U.S.C. § 3582(c)(1)(A).

To exhaust administrative remedies, a defendant must first present his request for compassionate release to the warden. After 30 days of submitting the request, the defendant may move for compassionate release in the district court, whether the warden has denied the request or has not acted. *Id.*; *United States v. Raia*, 954 F.3d 594, 595-96 (3d Cir. 2020).

Babbitt has properly exhausted administrative remedies. He filed a written request with the warden on May 4, 2020.[24] More than 30 days have passed since the warden received Babbitt's request. Therefore, we now consider the motion.

The threshold issue is whether the COVID-19 pandemic is an extraordinary and compelling reason for reducing the defendant's sentence. Neither the Sentencing

---

[23] *Id.*

[24] Govt.'s Resp. Ex. A.

Commission nor the BOP has determined that it is. Indeed, they have not identified any "other reasons" that qualify for a sentence reduction. Thus, the question is whether, absent such a determination, a court may decide what is an extraordinary and compelling reason for compassionate release.

The Sentencing Commission, for lack of a quorum,[25] has not updated Sentencing Guideline Section 1B1.13, its commentary or application notes. The outdated guideline does not take into account that the BOP is no longer the gatekeeper to the courts and the sole determiner of what "other reasons" are extraordinary and compelling. The Sentencing Commission itself recognizes that its policy statement and commentary are outdated in light of the FSA's changes. *See* "Compassionate Release," *The First Step Act of 2018: One Year of Implementation*, United States Sentencing Commission, at 47 (August 2020), www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/ 2020/20200831_First-Step-Report.pdf. As the Commission acknowledges, "[t]he statutory changes made by the First Step Act did not make any changes to the Guidelines Manual, nor did the Act provide emergency amendment authority to the Commission. Thus, the policy statement at § 1B1.13 does not reflect the First Step Act's changes." *Id.*

Not to make these determinations now would frustrate the will of Congress, which intended that the statute be used more often and on a broader scope. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194 (2018), entitled "Increasing the

---

[25] The Sentencing Commission is currently unable to update Section 1B1.13 or its commentary because it lacks the necessary quorum. "ESP Insider Express Special Edition: First Step Act," United States Sentencing Commission, Office of Education & Sentencing Practice at 5 (February 2019), https://www.ussc.gov/sites/default/files/pdf/training/newsletters/2019-special_FIRST-STEP-Act.pdf.

Use and Transparency of Compassionate Release."[26] Legislative history supports this conclusion. Senator Cardin explained: "[T]he bill expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. Rec. 192, at S7314, 2018 WL 6350790 (Dec. 5, 2018).

It was not unreasonable for the Sentencing Commission to delegate the authority to discern what was an other extraordinary and compelling reason to the BOP because it was the gatekeeper. The Commission had no need to issue a policy statement explicating other reasons for granting motions because courts had no real role in deciding what was a qualifying reason.

Now, the courts have the power to grant motions without the BOP's moving or approving them. To permit the BOP to define what reasons qualify for compassionate release would essentially give it a gatekeeping role, one that Congress took from it.

Given that the BOP is no longer the gatekeeper, it cannot set the policy for compassionate release. It makes no sense to have the BOP determine what is an extraordinary and compelling reason for reduction when it no longer exclusively controls the process. It cannot make the rules. The outdated Sentencing Commission policy statement is premised on a process that Congress has replaced. The Commission, for reasons not of its making, has not issued a new policy statement taking into account the

---

[26] The title and preamble of an act can provide insight into its meaning. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* § 34, at 218 (2012) (Preambles "set forth the assumed facts and the purposes that the majority of the enacting legislature . . . had in mind, and these can shed light on the meaning of the operative provisions that follow"); *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.,* 331 U.S. 519, 528–529 (1947)) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute."); *I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

change to the process entrusting the courts with the power to grant sentence reductions upon a defendant's motion without the BOP's input.

The statute provides that a reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). There is no longer any policy statement that applies because Congress changed the process, significantly diminishing the role of the BOP in it. There is no reason for the Sentencing Commission, when it eventually has a quorum, to delegate authority to the BOP to decide what "other reasons" qualify as extraordinary and compelling.

To continue relying on BOP criteria and allowing the BOP to establish the grounds for a sentence reduction under Section 3582(c)(1)(A) would be inconsistent with the amended statute. It would allow the BOP to continue exercising a gatekeeping role by defining or limiting the grounds for compassionate release. Likewise, the Sentencing Commission's outdated guideline and commentary is inconsistent with the letter and the spirit of the current compassionate release statute.[27] On the other hand, a court determining what constitutes a qualifying extraordinary and compelling reason is not inconsistent with any policy statement issued by the Sentencing Commission. There is no applicable policy statement to the contrary. Thus, we conclude that a court has the authority and responsibility to determine what is an extraordinary and compelling reason for a sentence reduction under Section 3582(c)(1)(A).

*COVID-19*

We now consider whether the COVID-19 pandemic and its impact on the prison population in a given case may warrant relief under Section 3582(c)(1)(A).

---

[27] The Guidelines Manual Commentary is authoritative unless it violates a federal statute or is inconsistent with the guideline. *United States v. Stinson*, 508 U.S. 36, 38 (1993).

A generalized, non-specific threat of harm due to the COVID-19 pandemic alone is not a sufficient reason to grant compassionate release. As the Third Circuit stated, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597. *See also United States v. Roeder*, 807 F. App'x 157, 161 (3d Cir. 2020) ("[T]he existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence.").

To determine whether extraordinary and compelling reasons exist in an individual case, we consider the circumstances of the COVID-19 pandemic, the defendant's health conditions, the defendant's age and the risk of contracting COVID-19 at the defendant's facility. None of these reasons alone is an extraordinary or compelling reason. Health complications without the risk of COVID-19 at a particular institution do not warrant release. Similarly, the fact that a facility may have confirmed cases of COVID-19 does not justify release if the defendant is not at risk due to age or other medical conditions. However, a combination of these circumstances may rise to the level of "extraordinary and compelling." Hence, each case must be determined by the facts unique to the defendant.

   1.  Background on the COVID-19 pandemic

The novel coronavirus, or SARS-CoV-2, is a virus that causes COVID-19, a serious respiratory disease that makes people severely ill, requiring hospitalization and

in some cases leading to death.[28] COVID-19 is estimated to be ten times more lethal than the seasonal flu, with about 20% of infected patients requiring hospitalization.[29] As of October 21, 2020, COVID-19 has infected over 40 million people worldwide, resulting in over 1.1 million deaths.[30] There is currently no cure or vaccine.[31]

COVID-19 is highly infectious and spreads through respiratory droplets produced from talking, coughing or sneezing.[32] Many infected people are asymptomatic but may still transmit the virus.[33] In fact, experts believe that asymptomatic people may be one of the driving forces behind the spread of the outbreak.[34] The only way to slow the spread

---

[28] *See* "Q&A on coronaviruses (COVID-19)," World Health Organization (Apr. 17, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

Like COVID-19, Severe Acute Respiratory Syndrome (SARS), first identified in 2003, is caused by a coronavirus known as SARS-CoV. "COVID-19 vs. SARS: How Do They Differ?," Healthline (April 29, 2020), https://www.healthline.com/health/coronavirus-vs-sars. Middle East Respiratory Syndrome (MERS), first identified in 2012, is caused by a coronavirus known as MERS-CoV. *Id.* SARS and COVID-19 share many similarities, including their method of transmission, their symptoms, and the dangers they pose to certain at-risk groups. *Id.*

[29] Pien Huang, "How The Novel Coronavirus And The Flu Are Alike . . . And Different," NPR (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different; "Similarities and Differences between Flu and COVID-19," Centers for Disease Control and Prevention (July 10, 2020), https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm.

[30] "WHO Coronavirus Disease (COVID-19) Dashboard," World Health Organization, https://covid19.who.int/ (updated daily).

[31] "Similarities and Differences between Flu and COVID-19," *supra* note 29.

[32] *Id.*

[33] "Transmission of SARS-CoV-2: implications for infection prevention precautions," World Health Organization (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions; Nathan Furukawa, John Brooks and Jeremy Sobel, "Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic," 26.7 EID Journal (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[34] Seyed Moghadas, Meagan Fitzpatrick, Pratha Sah, Abhishek Pandey, Affan Shoukat, Burton Singer and Alison Galvani, "The implications of silent transmission for the control of COVID-19 outbreaks," PNAS (July 6, 2020), https://www.pnas.org/content/early/2020/07/02/2008373117.

of COVID-19 is to conduct widespread testing, and enforce wearing face masks in public settings and other social distancing measures.[35]

The United States is the world leader in COVID-19 diagnoses, with over 8 million confirmed cases and more than 218,000 deaths.[36] The number of confirmed cases in the United States continues to rise.[37] Experts believe the reported numbers underrepresent the outbreak's true spread, as many areas are not conducting enough testing.[38] The federal government and every state declared states of emergency, with more than half of the states and the District of Columbia imposing lockdown restrictions on their residents at different times and for varying periods of time.[39] The Third Circuit has recognized that the COVID-19 pandemic "has given rise to exceptional and exigent circumstances that require the prompt attention of the courts." *Roeder*, 807 F. App'x at 161.

2. Babbitt's medical conditions

The U.S. Centers for Disease Control and Prevention have identified a number of health conditions and complications that place individuals at greater risk of severe illness,

---

[35] "WHO Coronavirus Disease (COVID-19) Dashboard," World Health Organization, https://covid19.who.int/ (updated daily).

[36] Donald McNeil, Jr., "The U.S. Now Leads the World in Confirmed Coronavirus Cases," The New York Times (Mar. 26, 2020), https://www.nytimes.com/2020/03/26/health/usa-coronavirus-cases.html; "WHO Coronavirus Disease (COVID-19) Dashboard," *supra* note 35.

[37] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lostfebruary/608521/.

[38] *Id.*

[39] *See* Rachel Treisman, "Which States Are Reopening? A State-By-State Guide," NPR (June 29, 2020), https://www.npr.org/2020/03/12/815200313/what-governors-are-doing-to-tackle-spreading-coronavirus; "Lockdowns, closures: How is each US state handling coronavirus?" Al Jazeera (Apr. 14, 2020), https://www.aljazeera.com/news/2020/03/emergencies-closures-states-handling-coronavirus-200317213356419.html.

hospitalization and death from COVID-19. Among these risk factors are hypertension, serious heart conditions such as heart failure, coronary artery disease and cardiomyopathies, cerebrovascular diseases such as stroke, and chronic bronchitis,[40] all of which Babbitt has. According to the CDC, "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."[41]

The risk for severe illness or death also increases with age, with adults aged 65 or older at highest risk.[42] In fact, the CDC reports that eight out of ten COVID-19 related deaths in the United States have been among adults aged 65 or older.[43] Babbitt is 66 years old, placing him in this highest-risk age bracket.

### 3. Risk of COVID-19 infection in prison

In the United States, roughly 2.1 million adults are incarcerated.[44] The CDC has recognized the particular vulnerability of incarcerated persons to COVID-19 infection in its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." According to the CDC, correctional and detention facilities present "unique challenges for control of SARS-CoV-2 transmission among

---

[40] "Coronavirus Disease 2019 (COVID-19): People of Any Age with Underlying Medical Conditions," Center for Disease Control and Prevention (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[41] *Id.*

[42] "Coronavirus Disease 2019 (COVID-19): Older Adults," Center for Disease Control and Prevention (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[43] *Id.*

[44] Laura Maruschak and Todd Minton, "Correctional Populations in the United States, 2017-2018," Office of Justice Programs: Bureau of Justice Statistics at 1-2 (August 2020), https://www.bjs.gov/content/pub/pdf/cpus1718.pdf.

[inmates], staff, and visitors."[45] Incarcerated people live, work, eat, study and participate in activities in congregate environments, with few options for social distancing due to crowded conditions.[46] Daily staff movements, transfers of people between facilities and systems, and visits from outsiders such as family or legal representatives create many opportunities to introduce COVID-19 to a facility.[47] The high turnover rate at correctional and detention facilities, as well as residents often coming from a variety of geographic locations, adds to the risk.[48] *See also Raia*, 954 F.3d at 596 (noting that COVID-19 is "a highly contagious respiratory virus which . . . exposes unique risks in population-dense prison facilities") (citations omitted).

These risks are real. As of June 16, the five largest known clusters of COVID-19 in the United States grew inside correctional facilities.[49] In May, the number of confirmed cases among prisoners doubled and deaths increased by 73 percent.[50] One in seven tests conducted on prisoners was positive.[51] The majority of infected people in prison are asymptomatic, but can still transmit the virus to more vulnerable people.[52] Since the

---

[45] "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," Centers for Disease Control and Prevention (July 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide* (June 16, 2020), https://www.nytimes.com/2020/06/16/us/coronavirusinmates-prisons-jails.html.

[50] *Id.*

[51] *Id.*

[52] *Id.*

outbreak began, 127 people in federal custody and 2 BOP staff members have died from COVID-19.[53] Over 16,500 prisoners and 2,000 staff have tested positive.[54] There are confirmed active cases at 120 BOP facilities.[55] It is reported that incarcerated persons are being infected at a rate more than 6.5 times higher than in the United States.[56] To address the rapid spread of COVID-19 in federal prisons, Congress passed the CARES Act authorizing the Attorney General to expand the use of home confinement to protect vulnerable prisoners from COVID-19 infection.[57] Despite this legislative expansion, the BOP has transferred less than 5 percent of the individuals in its custody to home confinement.[58]

Babbitt is incarcerated at FCI Elkton, a facility with a significant COVID-19 outbreak. There have been 922 reported cases of COVID-19 among inmates at FCI Elkton, and 54 among staff.[59] Nine inmates have died.[60] FCI Elkton is a low-security prison with open, dormitory-style housing.[61] Cubicles measure about 80 square feet, with

---

[53] Bureau of Prisons, "COVID-19 Coronavirus" (updated daily), https://bit.ly/2SOsQpe.

[54] *Id.*

[55] *Id.*

[56] "Defender Community Urges Legislative Action to Address COVID-19 Humanitarian Crisis in Federal Prisons," Federal Defender Services Office, Training Division (May 11, 2020) https://www.fd.org/news/defender-community-urges-legislative-action-address-covid-19-humanitarian-crisis-federal; "BOP-Reported Positive Tests for COVID-19 Nationwide," Federal Defenders of New York (2020), https://federaldefendersny.org/assets/uploads/BOP_Numbers.4.20.pdf.

[57] *Coronavirus Aid, Relief, and Economic Security Act*, H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2)(2020) ("CARES Act").

[58] *See* "COVID-19 Coronavirus," *supra* note 53.

[59] *Id.*

[60] *Id.*

[61] Keri Blakinger and Keegan Hamilton, "'I Begged Them to Let Me Die': How Federal Prisons Became Coronavirus Death Traps," The Marshall Project (June 18, 2020),

low walls, no door and only room for one person to stand up at a time.[62] The inmates are responsible for cleaning and sanitation.[63] These conditions make it an "excellent incubator[ ] for COVID-19."[64]

Several courts have recognized the heightened risk of COVID-19 infection in prison, particularly at FCI Elkton. Judge Brody noted that the first cases of COVID-19 appeared at FCI Elkton after the BOP assured that it was taking aggressive action to contain the disease. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 404 (E.D. Pa. 2020). Judge Padova concluded that the BOP "has failed to contain the spread of the COVID-19 virus at FCI Elkton." *United States v. Polley*, No. 18-196, 2020 WL 3574373, at *2 (E.D. Pa. June 30, 2020).

In June, Senator Sherrod Brown and Representatives Marcy Kaptur, Marcia Fudge and Tim Ryan expressed concern over the conditions at FCI Elkton and the prison's efforts to address its outbreak, including the crowded conditions that prevent meaningful social distancing.[65] In their letter to the BOP Director, they claimed the BOP has "failed to take steps to protect inmates and staff" and was "slow to institute the necessary reforms to protect individuals."[66] They were also disturbed by the BOP's status reports, which

___

https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps.

[62] *Id.*

[63] *See Inmate Information Handbook, Federal Bureau of Prisons FCI Elkton, Ohio* at 9, Bureau of Prisons (2012), https://www.bop.gov/locations/institutions/elk/ELK_aohandbook.pdf.

[64] Blakinger and Hamilton, *supra* note 61.

[65] "Brown, Kaptur Demand Answers on Spread of Covid-19 at Elkton Prison Facility, Urge Bureau of Prisons to Do More to Stop Spread of Virus, Protect Everyone There," Sherrod Brown, Senator for Ohio (June 8, 2020), https://www.brown.senate.gov/newsroom/press/release/brown-kaptur-spread-covid-19-elkton-prison-facility.

[66] *Id.*

revealed a "lack of testing" and a "poor understanding of the size and scope of the vulnerable population at the facility."[67]

The fact that Babbitt has already contracted COVID-19 at FCI Elkton and the treatment he received for his illness reveals the prison's failed efforts to protect its residents from the virus. Babbitt exhibited clear symptoms of COVID-19 on April 2, 2020. The notes in his medical records state "[s]uspect for COVID-19 Coronavirus like illness."[68] Despite his obvious condition, he was released from isolation on April 10, 2020 without a COVID-19 test. He was placed back in isolation a month later. When he was finally tested, the results were positive. Rather than testing him immediately and quarantining him for a longer period of time after his symptoms abated, the medical staff allowed him to return to the prison's general population, where he may have unknowingly infected countless others.

Although it appears that Babbitt has recovered, he is still at risk for re-infection. According to the World Health Organization, "[t]here is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[69] A study in Spain revealed that only five percent of the more than 60,000

---

[67] *Id.*

[68] Health Services Record at Babbitt_00050.

[69] "'Immunity passports' in the context of COVID-19," World Health Organization (Apr. 24, 2020) https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19. *See also* Patrick Henry, "WHO: 'No Evidence' That COVID-19 Antibodies Protect From Potential Re-infection," TIME (Apr. 25, 2020), https://time.com/5827450/who-coronavirus-antibodies-reinfection/; Robert Kirkcaldy, Brian King, and John Brooks, "COVID-19 and Postinfection Immunity: Limited Evidence, Many Remaining Questions," JAMA (May 11, 2020), https://jamanetwork.com/journals/jama/fullarticle/2766097 ("[W]hether immunity occurs among individuals after they have recovered from COVID-19 is uncertain. Many human infections with other viral pathogens, such as influenza virus, do not produce a durable immune response.").

people tested had antibodies, despite COVID-19's prevalence in the country.[70] Several countries, including Hong Kong, Belgium, the Netherlands and the United States, have confirmed cases of re-infection.[71] In some cases, the second infection was more serious than the first.[72] Babbitt's age, underlying medical conditions, his COVID-19 morbidity and his weakened state from his prior infection combined with the dangerous conditions at FCI Elton mean that a second infection could be fatal.

We find that the combination of these unique circumstances rises to the level of "extraordinary and compelling." Babbitt suffers from a number of serious medical conditions associated with increased risk for COVID-19. His age places him in the highest-risk category for serious illness or death from COVID-19. He is housed at a facility where almost 1,000 inmates have contracted the virus, including himself. He is at continual risk for re-infection due to FCI Elton's living conditions, which could prove fatal. As Judge Brody astutely noted, for defendants like Babbitt facing certain health risks, "nothing could be more extraordinary and compelling than this pandemic." *Rodriguez*, 451 F. Supp. 3d at 394.

---

[70] Edmund DeMarche, "Herd immunity may not be achievable in fight against coronavirus," Fox News (July 7, 2020), https://www.foxnews.com/health/herd-immunity-may-not-be-achievable-in-fight-against-coronavirus. According to a professor of immunology at Imperial College London, COVID-19 is "a very deceitful virus" and "immunity to it is very confusing and often short-lived." *Id.*

[71] Andrew Joseph, "Scientists are reporting several cases of Covid-19 reinfection – but the implications are complicated," State News (Aug. 28, 2020), https://www.statnews.com/2020/08/28/covid-19-reinfection-implications/.

[72] *Id. See also* Brenda Goodman, MA, "Dutch Woman First to Die After COVID-19 Reinfection," WebMD (Oct. 14, 2020), https://www.webmd.com/lung/news/20201014/dutch-woman-first-to-die-after-covid-19-infection.

*Danger to the Community*

Not every defendant who presents a qualifying extraordinary and compelling reason is entitled to relief under Section 3582(c)(1)(A). The Section 3553(a) factors may militate against a sentence reduction. Likewise, a Section 3142(g) finding that the defendant may present "a danger to any other person or to the community" precludes a sentence reduction. U.S.S.G. § 1B1.13(2).

Before granting a motion for compassionate release based on an extraordinary and compelling reason, a court must find that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). The applicable Section 3142(g) factors include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The government argues that Babbitt's positive COVID-19 diagnosis renders him a danger to the community.[73] It contends that Babbitt must be kept incarcerated to protect the public health and prevent the spread of the disease.[74] The government also argues that Babbitt poses a danger to the community because his offenses can be committed at home, requiring only an internet connection.[75] It states that the frequent home visits and

---

[73] Govt.'s Resp. at 11.

[74] *Id.*

[75] *Id.* 19-20.

lengthy period of supervision necessary to ensure Babbitt does not commit additional crimes would in turn increase the risk of spreading COVID-19.[76] It claims that the resources Babbitt needs to reduce the likelihood of re-offense, including individual and group therapy, community-based mental health services, supervision of his internet access, education, volunteer work and adult-focused hobbies are unavailable under current state and local social distancing orders.[77] According to the government, the challenging and isolating circumstances of home confinement increase Babbitt's risk of re-offense.[78]

We find that Babbitt does not present a danger to others or the community. He has always admitted his guilt and acknowledged the seriousness of his offenses. He has no prior criminal history. He is not violent. He readily admitted his conduct, spoke freely to law enforcement, cooperated in their investigation and turned himself in on his arrest warrant. He has had no infractions or other disciplinary issues while in prison.

Babbitt committed these offenses during a dark period of his life shortly after his daughter committed suicide, he suffered several serious physical ailments, including heart surgery and a stroke, and he fell into a deep depression. He sought professional counseling, completing eight therapy sessions and attending regular sexaholics anonymous group meetings before his incarceration. In her psychosexual evaluation, Dr. Catherine Surbeck concluded that Babbitt was at a low risk for sexual re-offense.[79]

---

[76] *Id.* at 20.

[77] *Id.* at 20-21.

[78] *Id.* at 21.

[79] Def.'s Sent. Memo. Ex. D at 13 (ECF No. 25).

Through therapy, he gained an understanding of why he became addicted to pornography, including child pornography, and made significant progress towards rehabilitation.[80] He has a stable and supportive family life.[81] Upon his release, he will live with his wife of 22 years and adult step-daughter, who have remained supportive during his incarceration and who will take care of him.[82]

Babbitt's COVID-19 diagnosis in May does not make him a danger to the community today. He can be ordered to quarantine in his home upon his release and his future travel outside the home can be restricted.

*Section 3553(a) Factors*

Section 3582(c)(1)(A) requires a court to consider whether a sentence reduction is warranted under the factors detailed in 18 U.S.C. § 3553(a) before granting a sentence reduction. Section 3553(a) instructs district courts to "impose a sentence 'sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)). Similar to the Section 3142(g) factors, the applicable Section 3553(a) factors include: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide punishment, deter criminal conduct and protect the public from further crimes by the defendant; (3) the kinds of sentences and sentencing ranges available; and (4) the

---

[80] Def.'s Sent. Memo. at 4, Ex. B, Ex. D at 14; Def.'s Reply in Supp. of Em. App. for Mod. of Sent. at 6-7 (ECF No. 35)

[81] Def.'s Sent. Memo. at 2, Ex. A.

[82] Def.'s Reply at 6.

need to avoid unwarranted sentence disparities among defendants committing similar offenses. 18 U.S.C. § 3553(a).[83]

The government cites the seriousness of Babbitt's offenses, as well as the continuing harm to the victims of child sexual abuse and exploitation, as factors weighing against compassionate release.[84] It points to statements opposing compassionate release from the victims and families of victims who were depicted in the material Babbitt viewed and possessed.[85] The government reiterates the heightened risk of Babbitt recidivating while on home confinement given the nature of his offenses and the challenging circumstances posed by the pandemic.[86] It argues that releasing Babbitt when he has only served one-third of his sentence does not reflect the seriousness of his offenses, promote respect for the law or provide just punishment for his conduct.[87]

Babbitt has already served 25 months. He will serve six years of supervised release under stringent conditions. As a convicted felon, he will face numerous collateral consequences in his life after incarceration.[88] Thus, a reduced prison sentence will provide punishment and deter future criminal conduct, and will not diminish the seriousness of his offense and respect for the law.

---

[83] Because Section 3553(a) establishes factors for courts to consider when initially imposing a sentence, not every factor listed applies to the compassionate release context. *Rodriguez*, 451 F. Supp. 3d at 406.

[84] Govt.'s Resp. at 16-19.

[85] Govt.'s Supp. Resp. at 1-2, Ex. A-C.

[86] Govt.'s Resp. at 20-21.

[87] *Id.* at 21.

[88] *Collateral Consequences of Conviction Project*, American Bar Association, https://www.americanbar.org/groups/criminal_justice/niccc/ (cataloging "over 45,000 federal and state statutes and regulations that impose collateral consequences on persons convicted of crimes").

Babbitt has a stable home life, has no prior criminal history, is committed to his rehabilitation and is unlikely to recidivate. He has expressed interest in continuing psychological counseling.[89] He has no history of substance abuse. Upon release, he will live with his wife and 37 year-old step-daughter.

Babbitt is 66 years old with several comorbidities associated with increased risk from COVID-19. His continued incarceration not only puts him at grave risk, but may also interfere with his ability to receive necessary medical care should he become sick again. 18 U.S.C. § 3553(a)(2)(D).[90] These factors weigh in favor of a sentence reduction.

## Conclusion

We find that the combination of the COVID-19 pandemic, Babbitt's compromised health and the risk of COVID-19 re-infection at FCI Elkton constitute extraordinary and compelling reasons to grant a sentence reduction. Babbitt's age and health place him at grave risk of severe illness or death if he continues to serve his sentence. He is not a danger to the community, and the Section 3553(a) factors support compassionate release. Therefore, we shall grant his motion for a sentence reduction.

---

[89] Def.'s Sent. Memo. at 4; Def.'s Reply at 6-7.

[90] *See also* Joseph Neff and Beth Schwartzapfel, "Infected, Incarcerated – and Coming to an ICU Near You?," The Marshall Project (April 16, 2020) https://www.themarshallproject.org/2020/04/16/infected-incarcerated-and-coming-to-an-icu-near-you ("Federal prisons with many coronavirus cases have been sending the sick to regular hospitals in nearby cities. Joseph Mayle, the staff-union representative at the facility in Elkton, Ohio, south of Youngstown, said Tuesday that 34 prisoners have been sent to local hospitals. Half are on ventilators.").